FILED

2005 Sep-30  PM 04:26
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| CAROL TOMBLIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CV 02-B-2389-NE |
| | ) | |
| DILLARD'S, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This case is presently pending before the court on defendant's Motion for Summary Judgment.  (Doc. 35.)  Plaintiff Carol Tomblin has sued her former employer, defendant Dillard's, Inc., alleging that defendant discriminated against her on the basis of her age and her  gender, and that it retaliated against her for complaining about discrimination, in violation of federal law.   Plaintiff also alleges state-law causes of action for negligent, wanton, and/or intentional hiring and retention, as well as failure to train and to supervise. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Summary Judgment (doc. 35) is due to be granted in part and denied in part.

## I.  SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(c), summary judgment is appropriate when the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The moving party bears the

initial burden of showing no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and show that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and, therefore, evidence favoring the non-moving party is to be believed and all justifiable inferences are to be drawn in her favor. *See id.* at 255.  Nevertheless, the non-moving party need not be given the benefit of every inference but only of every ***reasonable*** inference.  *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II.  <u>STATEMENT OF FACTS</u>

### A.  PLAINTIFF BEGINS WORKING FOR CASTER-KNOTT.

Plaintiff Carol Tomblin was born on November 4, 1955, and was over the age of 40 at all times relevant to this action.  (*See* doc. 36, Ex. A at 6.)  Plaintiff began her employment

with the defendant's predecessor in 1979.  (*Id.* at 12-13.)  She began working in the Sales Audit Office and, in 1983, she moved to Cosmetics Department.  (*Id.* at 13.)  Defendant's predecessor promoted plaintiff three times in the next ten years.  (*See id*. at 13-14.)  Throughout her employment, plaintiff worked at the store in Madison Square Mall in Huntsville, Alabama.  (*Id.* at 15.)

## B.  DEFENDANT TAKES OVER THE STORE

In 1998, defendant Dillard's, Inc., took over the Madison Square Mall store, and that store became defendant's Store No. 456.  (*Id.* at 14-15.)  When defendant took over, it placed plaintiff in the Men's Department as an Assistant Area Sales Manager.  (*Id.* at 16-17.)  Defendant later promoted plaintiff to Area Sales Manager ["ASM"] over the Juniors' Department, the Women's Department, the Petites' Department, and the Lingerie Department.  (*Id.* at 17-18.)

At the time defendant acquired the Store No. 456, the Store Manager was  Bill Marrero,  and the Operations Manager was Mary Davis.  (*Id.* at 15-16; *id*., Ex. B at 33-34.)  From 1998 through early 2000, Marrero and Davis reported to Divisional President, Burt Squires.  (*Id*., Ex. C at 22.)  In early 2000, Marrero and Davis began reporting to Rick Willey, District Manager.  (*Id.* at 22-23.)

The performance reviews in plaintiff's personnel file show "good" to "outstanding" job performance.  (Doc. 39, Ex. B at 00053-54, 00056, 00058, 00065.)  Marrero never

counseled Tomblin regarding problems with theft or shortages in her areas.  (*See* doc. 36, Ex. A at 81.)

## C.  DAVIS BECOMES ACTING STORE MANAGER

Marrero left defendant the first of September 2000, and Davis served as Interim Store Manager.  (*Id*. at 16.)  Plaintiff testified that she did not receive any warnings from Davis regarding inventory, staffing, training, or other issues before her termination.  (*Id*. at 140-45 and ex. 7; doc. 39, Ex. I ¶ 5.)  However, the record contains a document, prepared by Davis, which purports to document Davis's verbal counseling of plaintiff on September 9, 2000.  (*See id*, Ex. A, ex. 7.)  This memo states:

I had a verbal conversation today [with] Carol  regarding:

1)  Associate performance

– standing around wrap stand

– personal phone calls

– productivity

– Customer service

2)  Follow up on lingerie Co-ordinator[']s notes about changes [within] lingerie department that had not been completed

1)  categorization

2)  shop set-up

etc.

(*Id*.)  It is signed by Davis and dated September 9, 2000.  (*Id*.)

4

Plaintiff testified that she was not at work on September 9, 2000, because she had sprained her ankle. (*Id*., Ex. A at 145-47.) Moreover, she has a doctor's note that shows she was out of work on September 9, 2000. (*Id*., ex. 8.) The court finds that this evidence supports a finding that Davis fabricated the alleged counseling of September 9, 2000.

Plaintiff testified that prior to her termination she was unaware that defendant found fault in her job performance. (Doc. 39, Ex. I ¶ 5.) She testified that she followed the procedures for entering "marked out of stock" and "damages" into the computer system. (Doc. 36, Ex. A at 74.) She worked with her sales associates to follow the markdown procedures and enter the markdowns into the computer system. (*Id*. at 59-60.) Plaintiff also kept an ongoing list of suspected theft items and entered this information on a weekly basis as required. (*Id*. at 73, 76.)

Defendant's practice was for Store Managers to send the ASMs a number each week, which was a percentage of the previous week's sales, to enter as theft and marked out of stock, thereby reducing the inventory. (*Id*. at 73-74, 76; doc. 39, Ex. C ¶ 6.) However, after Davis became acting Store Manager, she did not follow this practice. (Doc. 39, Ex. C ¶¶ 6-7; *id*., Ex. I ¶ 7.) Indeed, no theft or marked out of stock deductions from inventory were taken by defendant's store No. 456 between Marrero's resignation and Moretti's arrival. (*Id*., Ex. C ¶ 9; *see also* doc. 36, Ex. D ¶ 4.)

**D.  INTERIM DENIM INVENTORY**

Defendant conducts a store-wide inventory in January and June of each year, and two additional, interim inventories are performed for denim only.  (Doc. 36, Ex. A at 25, 27-28; *id.*, Ex. B at 167.)  In October 2000, the Huntsville store had its first ever interim denim inventory.  (*Id.*, Ex. C at 183.)  This interim inventory revealed a shortage in plaintiff's areas of responsibility of $162, 511.  (*Id.*, Ex. D ¶ 4.)  Defendant alleges that it determined the shortage was caused by "[i]mproper markdowns, improper training of sales associates, the fact that no marked out of stocks were taken [from the July inventory until the October interim inventory, and ] . . . [i]mproper inventory that was marginized, left off the inventory." (*Id.*, Ex. C at 187.)

Davis as Operating Manager, was in charge of managing the interim denim inventory, and, as Acting Store Manager, she was ultimately responsible for the inventory.  (*Id.* at 101.) At the time of the interim inventory, some of the denim stock assigned to the Junior's Department was located in other areas of the store.  (*Id.* at 191.)  Although reminded several times about this stock, Davis specifically directed those employees counting the denim stock not to count the denim stock physically located in other parts of the store.  (Doc. 39, Ex. I ¶ 6; *id*, Ex. G ¶ 6.)

During and after the inventory, Davis told plaintiff that everything was "great."  (*Id.*, Ex. I ¶ 6; doc. 36, Ex. A at 156-57; *see also* doc. 39, Ex. G ¶ 6.)

Davis testified that defendant would not terminate an ASM for "a bad inventory itself;" she said defendant would only terminate an ASM if the bad inventory "was a consistent or repeated problem or [if there were] other performance issues."  (Doc. 36, Ex. C at 122.)

## E.  MORETTI SELECTED STORE MANAGER

Willey and Squires hired Steve Moretti for the position of Store Manager of Store No. 456 because "he had shown favorable performance in his prior job," and because he wanted to be closer to his children.  (Doc. 36, Ex. C at 154, 156.)    Moretti began working at the store on October 12, 2000.  (*Id.*, Ex. A at 16.)

## F.  MANAGEMENT TRAINING

Other than viewing two videos at the time an employee was hired, defendant did not provide training to its employees regarding discrimination and harassment.  (Doc. 36, Ex. C at 64-66, 139-40.)    Defendant does not have formal training regarding investigating complaints of discrimination or harassment.  (*Id.* at 71-72.)

## G.  MORETTI GRABS TOMLIN'S NECK

Shortly after Moretti began working at the Huntsville store, he was on the sales floor discussing with plaintiff a display in her department.  (Doc. 36, Ex. A at 94-95.)  Moretti said to plaintiff, "[Y]our wall looks like shit."  (*Id.* at 95, 152; *see also* doc. 39, Ex. G ¶ 9; *id.*, Ex. H at 19-24,39-40, 50-51.)  At the same time, Moretti grabbed plaintiff by the neck and turned her head toward the display.  (Doc. 36, Ex. A at 99, 100.)  In response to defendant's

question regarding how long Moretti held her by the neck, plaintiff testified, "It felt like eternity.  It was probably five, six seconds.  It was longer than just a grab, and he let go, because he made me to look at the wall that he didn't like.  And I was just frozen in time. And I said stop.  And just at that time, he had a page, and he walked off to go answer the page.  And I didn't see him again."   (*Id*. at 99-100.)  Plaintiff also testified that Moretti "squeezed" her neck, that "it was painful," and that her neck was sore until the following day. (*Id*. at 99-100, 104.)  This incident left plaintiff shocked and upset.  (Doc. 39, Ex. G ¶ 9.)

## H.  MORETTI TRASHES THE LINGERIE DEPARTMENT

In another incident, plaintiff and the Visual Merchandiser, Joseph Brian Hall, had prepared the Lingerie Department for a visit from certain members of defendant's upper management.  (Doc. 39, Ex. H at 48.)  Thereafter, Moretti went through the department "yanking stuff off the racks" and throwing merchandise on the floor.  (*Id*. at 48-49.) According to Hall, Moretti left the Lingerie Department looking "like a tornado went through it," (*id*. at 48), and  plaintiff and her associates, with help from Hall, hurried to straighten up the department before the management visit, (*id*., Ex. I ¶ 10).  When the members of management arrived at the store, the Lingerie Department was still in the process of being put back in order.  (*Id*.)

## I. THE HIRING OF TAMIKA HOLMAN

On or about September 27, 2000, an African-American woman, Tamika Holman, applied for employment as a sales associate in the Junior's Department.  (Doc. 36, Ex. H at

13 and ex. 1.)  Plaintiff conducted Holman's first interview.  (*Id.* at 14-15.)  Plaintiff testified that she thought Holman was a good applicant because she had worked in another department store for a few years and she had a good sales record with that store.  (*Id.*, Ex. A at 191-92.)  During the interview, plaintiff acted in conformance with defendant's policy of having either the Operations Manager or Store Manager conduct the second interview on all applicants and informed Holman that she "would have to have a second interview in order to be hired."  (*Id.* at 15.)  Plaintiff did not tell Holman she was hired.  (*Id.*)

After Holman's interview, plaintiff placed Holman's application in a stack of applications of persons awaiting a second interview.  (*Id.* at 123.)  Because the second interview had not happened at the same time as the first, as was usual practice, plaintiff attached a "sticky note" to the application asking for any objections to Holman's application.  (*Id.* at 125-26.)

Sometime thereafter, plaintiff found Holman's application in her office mailbox; her "sticky note" was not attached.  (*Id.* at 125, 129.)  Plaintiff testified, "When I looked at the application, and I saw that my note had been taken off and there were no objections, I thought that the interview had happened and there was nothing that he [Moretti] had – you know, that he was perfectly happy with his applicants."  (*Id.* at 132.)

Holman testified that Davis had performed her second interview.  (*Id.*, Ex. H at 14-15.)  According to Holman, after the interview, Davis told her that she was hired and to come

to orientation.  (*Id*. at 17, 28.)  Moretti states that performing the second interviews was Davis's job duty.  (Doc. 39, Ex. N at 12.)

Orientation for new employees was on October 31, 2000.  (Doc. 36, Ex. A at 122.) Plaintiff was not scheduled to work that day, and she was next in the store on November 1, 2000.  (*Id*.)  On November 1, 2000, Davis asked plaintiff who had done Holman's second interview.  (*Id*. at 136-37.)  Plaintiff responded that Moretti had done so.  (*Id*. at 137.)  Davis did not tell plaintiff that she had conducted Holman's second interview.  (*See id*. at 136-39.) Also, Davis specifically told Moretti that she had not interviewed Holman or otherwise authorized Holman's hiring.  (*Id*., Ex. D ¶ 9.)

## J. TOMBLIN MEETS WITH MORETTI AND DAVIS

Sometime after speaking with plaintiff, Davis called plaintiff to Moretti's office.  (*Id*., Ex. A at 153.)  Plaintiff testified that, when she arrived, Moretti told her he had some concerns about her areas.  (*Id*. at 154.)  When she asked him to be more specific, Moretti began screaming, waving his arms in the air, and cussing.  (*Id*.)  According to plaintiff, Moretti yelled that "all [her] areas look[ed] like shit."  (*Id*.)

Moretti screamed at plaintiff that her inventory was short.  (*Id*. at 155.)  Plaintiff asked Moretti how the inventory looked bad when Davis had told her that everything with the inventory had gone well.  (*Id*. at 156-57.)  Moretti responded to plaintiff's inquiry by "just yelling and screaming."  (*Id*. at 158.)  Plaintiff testified, "I couldn't explain myself.  And the more I tried to explain myself, the louder he got and the more abrasive his language became."

10

(*Id.* at 156.)  Moretti told plaintiff, "I'm not going to take the fall, and [Davis] is not going to take the fall because I need her.  And that leaves you."  (*Id.* at 155-56.)

Moretti accused plaintiff of failing to take any markdowns for two to three months. (*Id.* at 168.)  Plaintiff denied the accusation and asked to retrieve paperwork she had kept to verify her markdowns, marked out of stock , and thefts.  (*Id.*)  Moretti refused.  (*Id.* at 168-69.)  Plaintiff tried to explain to Moretti that, although she had entered the appropriate numbers, if Marrero or Davis had not approved the entries, they would have "just drop[ped] out of the system."  (*Id.*)  In response, Moretti told plaintiff, "[T]hat doesn't matter.  . . . [T]he only thing that matters is what I say and what I see on this screen."  (*Id.* at 169.)

Moretti also accused plaintiff of lying about who had performed Holman's second interview.  (*Id.* at 159.)  Moretti testified that Holman had been dressed inappropriately at orientation.  (*Id.*, Ex. D ¶ 8.)  He said that Holman "was wearing baggy jeans and had a red bandana hanging from the back pocket of her pants," which Moretti testified was a "common gang symbol."   (*Id.*)  Holman, however, testified that she wore "a silver . . . silk blouse, black slacks, and a black and white blazer" to orientation.  (*Id.*, Ex. H at 26-27.)

Plaintiff testified:

[Moretti] ask[ed] me why would I want to hire a black gang banger that looked like this.  And what he did, he took her photocopy of her driver's license, and he was waving that in my face.

And I didn't even know what a gang banger was, and I thought it was vulgar.  And I couldn't believe he was talking like that.  And he said[, "N]ow, why in the world would you think I'd want to hire her; [she] and her black gang banger friends would rob the [J]unior [D]epartment blind.["]

(*Id.,* Ex. A at 188-89.)  For purposes of summary judgment the court finds (1) Holman was not inappropriately dressed at the orientation, and (2) Davis had approved the Holman hire.

During the meeting, Moretti had plaintiff sign a blank form.  (*Id.*, Ex. A at 178-79.) Moretti filled out the form after plaintiff had signed it.  (*Id.* at 179.)

## K.  MORETTI AND DAVIS TERMINATE PLAINTIFF

Davis testified that she and Moretti had not decided to terminate plaintiff prior to the November 1, 2000, meeting.  (*Id.*, Ex. B at 163-64.)  She testified that the decision to terminate plaintiff was made during the meeting and was based on the fact that plaintiff allegedly lied about Moretti interviewing Holman.  (*Id.* at 164.)  Davis testified:

> Q.  . . .  Is it your recollection that prior to [the November 1, 2000] meeting it was actually going to be a corrective interview where you discussed performance with her or had the decision been made to terminate her prior to this meeting?
>
> . . .
>
> A.  The decision to terminate her was made during the meeting.  Steve and I stepped out of the room.
>
> . . .
>
> Q.  . . .  Prior to the meeting you and Steve had discussed her performance and the need to talk to her about things you felt she needed to improve on, correct?
>
> A.  Correct.
>
> . . .
>
> Q.  What was it about the meeting that changed that to a termination?

. . .

A.  The fact that she lied.

Q.  What did she lie about?

A.  The incident with the young lady that was in orientation class.

Q.  How did she lie?

A.   When I asked her if who – if [Moretti] had done the second interview on this young lady and she told me yes.  I asked [Moretti] if he had interviewed this young lady.  He said, no, he had not.

. . .

Q.  I ask you again, had you decided to terminate Carol prior to this meeting?

A.  No, we had not.

(*Id*. at 164-165)  Moretti told one of plaintiff's coworkers that plaintiff "had hired a gang member to work in her department and lied about getting a second interview."  (Doc. 39, Ex. C ¶ 18.)  During this conversation, he "did not mention anything . . . about an inventory shortage or any other performance problems with [plaintiff]."  (*Id*.)  Also, at plaintiff's unemployment compensation hearing, Moretti testified that plaintiff was terminated because she had "lied to [his] face."  (Doc. 39, Ex. G at 9.)  He testified: "We had brought her down to discuss a bunch of situations that had taken place, and the fact that she did lie to my face was kind of the camel that – the straw that broke the camel's back."  (*Id*.)

13

## L.  DISCRIMINATORY COMMENTS

Although plaintiff testified that she never heard Moretti make any derogatory comments based on age or sex, (doc. 36, Ex. A at 203-04, 230-31), the record contains evidence that he, Wiley, and Davis had made remarks indicating a bias against the hiring of blacks, and evidence that Davis made ageist remarks about certain employees.

Rick Wiley allegedly told ASMs that they should not hire so many blacks.  (Doc. 39, Ex. C ¶ 19.)  Similarly, Moretti told ASM to be "careful" hiring blacks.  (*Id*. ¶ 17.)  He also told the ASMs not to hire students from Oakwood College or Alabama A&M, which are historically black colleges in the Huntsville area. (*Id*.)  Davis once told plaintiff that she had "too many of those black, lazy girls in lingerie," and that she "need[ed] to hire some more white people."  (Doc. 36, Ex. A at 196-97.)

Davis also told plaintiff that two elderly employees were "too slow and too old" to work at the store.  (*Id*. at 196.)  Davis told another employee that "several of the store's older sales associates were 'too old and too slow.'  She also said something about the store needing young blood.".) (Doc. 39, Ex. G ¶ 8.)  Davis also "suggested" that plaintiff should hire "younger people in the women's department."  (Doc. 36, Ex. A at 196-197.)

## M.  JUDITH ANDERSON INCIDENT

Before he moved to the Huntsville store, Moretti was Store Manager at a store in Littleton, Colorado. (Doc. 36, Ex. C at 157.)  One of Moretti's employees at the Littleton store, Judith Anderson, complained to defendant that Moretti had harassed her shortly before

14

he was selected for the position at the Huntsville store.  (*See* doc. 39, Ex. E at Bates no. 4589.)  Anderson's claims against Moretti arose out of dispute between Anderson and Moretti over Anderson's vacation pay.  (*See id*. at Bates nos. 4584-87.).  Anderson made the following claims against Moretti and defendant – FLSA violations, negligence, negligent supervision, negligent hiring, negligent infliction of emotional harm, intentional infliction of emotional harm, outrageous conduct, constructive wrongful termination, conspiracy to commit fraud, and continuing illegal enterprise.  (*Id*., Ex. E at 4589.)  The record does not contain any indication of the resolution of Anderson's claims.

## III.  DISCUSSION

### A.  AGE DISCRIMINATION – DISCHARGE

Plaintiff alleges that defendant terminated her because of her age.  (Doc. 17 ¶ 60.)

The Supreme Court has held:

> Under the ADEA, it is unlawful for an employer . . . to discharge any individual . . . because of such individual's age.  When a plaintiff alleges disparate treatment, liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision.  That is, the plaintiff's age must have actually played a role in the employer's decisionmaking process and had a determinative influence on the outcome.  Recognizing that the question facing triers of fact in discrimination cases is both sensitive and difficult, and that there will seldom be eyewitness testimony as to the employer's mental processes, the Courts of Appeals . . . have employed some variant of the framework articulated in *McDonnell Douglas* to analyze ADEA claims that are based principally on circumstantial evidence.  This Court has not squarely addressed whether the *McDonnell Douglas* framework . . . also applies to ADEA actions.  Because the parties do not dispute the issue, we shall assume, *arguendo*, that the *McDonnell Douglas* framework is fully applicable here.

15

*McDonnell Douglas* and subsequent decisions have established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases.  First, the plaintiff must establish a prima facie case of discrimination.  It is undisputed that [plaintiff] satisfied this burden here . . . .  The burden therefore shifted to [defendant] to produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason.  This burden is one of production, not persuasion; it can involve no credibility assessment.  [Defendant] met this burden by offering admissible evidence sufficient for the trier of fact to conclude that [plaintiff] was fired because of his failure to maintain accurate attendance records.  Accordingly, the *McDonnell Douglas* framework – with its presumptions and burdens – disappeared, and the sole remaining issue was discrimination vel non.

Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.  And in attempting to satisfy this burden, the plaintiff – once the [defendant] produces sufficient evidence to support a nondiscriminatory explanation for its decision – must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.  That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence.  Moreover, although the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the plaintiff's prima facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 141-43 (2000)(internal citations and quotations omitted).

Defendant contends that it terminated plaintiff because she had "'lied about the store manager approving a new hire when he had no knowledge of the situation;' because she had a bad inventory result; and because of her performance problems."  (Def. Br. In Supp. of

Mot. for Summ. J. at 10 [citing doc. 36, Ex. A at 9-10; *id.*, Ex. D ¶ 7].)  Defendant argues

that it is entitled to judgment as a matter of law as to plaintiff's age discrimination

termination claim because plaintiff cannot establish that defendant's articulated reasons for

terminating plaintiff are unworthy of credence.[1]  It argues:

> It is undisputed that Moretti did not interview Holman and that [plaintiff] falsely said he did.  [Plaintiff] has focused her evidence on whether Mary Davis interviewed Ms. Holman, but [plaintiff] was not discharged for claiming that Davis conducted the interview.   [Plaintiff] said Moretti authorized the hiring.  Nonetheless, it is undisputed that Davis (who is female and over 40) told Moretti that she had not interviewed or hired Holman, and it does not suggest age or sex discrimination that Moretti believed her.

> It is also undisputed that [plaintiff] had a shortage and budgeting errors amounting to approximately $165,000 in lost inventory in her area.  (Pl. depo. at 88-89, 148-49; Davis depo. at 196 and ex. 28.)  [Plaintiff] was still unable to explain the reasons for the shortage at the time of her deposition.  (Pl. depo. at 242.)  It is also undisputed that [plaintiff] had performance problems.  She had not followed the direction of her managers; she was not following [defendant's] staffing guidelines; she was not following [defendant's] merchandising practices; and she was not training her sales associates.  (Moretti Dec. ¶ 3.)  Poor job performance constitutes a legitimate, non-discriminatory reason for discharging an employee.  . . .  Plaintiff cannot dispute any of the three reasons for her discharge.  Therefore, [defendant] is entitled to summary judgment.

(Def. Br. in Supp. of Mot. for Summ. J. at 10-11.)

"To satisfy this threshold showing of pretext, a plaintiff may discredit the employer's

proffered legitimate reasons by showing (1) that the proffered reasons had no basis in fact,

---

[1]Defendant does not discuss whether or not plaintiff can establish prima facie case of age discrimination with regard to her termination.  Therefore, for purposes of summary judgment, the court assumes that plaintiff can establish a prima facie case of age discrimination.

(2) that the proffered reasons did not actually motivate the employment decision, or (3) that they were insufficient to motivate the employment decision." *Walker v. NationsBank of Florida N.A.*, 53 F.3d 1548, 1564 (11th Cir. 1995)(Johnson, J., concurring).  According to defendant's Amended Response to Plaintiff's Interrogatories, "Steve Moretti made the decision to terminate Ms. Tomblin's employment, ***in consultation with Mary Davis***." (Doc. 36, Ex. C, ex. 3 at 11 (emphasis added).)  Davis testified that she and Moretti decided to terminate plaintiff during the meeting to discuss the performance issues because of plaintiff's lie regarding the second Holman interview.  This testimony is sufficient to allow a reasonable jury to find that defendant's other articulated reasons for plaintiff's termination – the inventory shortage and the performance problems – did not actually motivate Davis and Moretti to fire plaintiff.  *See Walker*, 53 F.3d at 1564.

As to the remaining articulated reason for plaintiff's termination, the lie regarding Holman, the court finds that plaintiff has presented sufficient evidence to rebut defendant's summary judgment showing.  Assuming the facts in the light most favorable to plaintiff, Davis ***knew*** that plaintiff had not hired Holman without a second interview because she had actually conducted the second interview.  A jury could find that defendant would not have terminated plaintiff for the lie under the circumstances as known by Davis, one of the decisionmakers:  that is – no reasonable employer would be motivated to terminate plaintiff because she "lied" under the following circumstances:

> (1) only two store employees could perform the second interview of an applicant – Moretti and Davis;

18

(2)  Davis performed the second interview of Holman;

(3)  Davis asked plaintiff who had performed the second interview of Holman and plaintiff told her Moretti had performed the interview;

(4)  Davis knew that Moretti had not performed the second interview because she had interviewed Holman;

(5)  Davis told Moretti that plaintiff had told her that he had performed the second interview of Holman;

(6)  Plaintiff admits to Moretti that she told Davis he had performed the interview;

(7)  Davis and Moretti decide to terminate plaintiff allegedly because she lied to Moretti, despite the fact that Davis knew she had interviewed Holman, that the nature of her question to plaintiff inferred that Moretti, and not Davis, must have performed the Holman second interview, and that Davis had lied to Moretti.

Defendant argues that plaintiff must meet its articulated reason "head on and rebut it." While the Eleventh Circuit has stated that a plaintiff must meet the articulated reason head on and rebut it, this statement is not without limits.  Indeed, that court held, "Provided that the proffered reason is one that might motivate a *reasonable* employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarrelling with the wisdom of the reason."  *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).  The court finds that a "reasonable employer" would not be motivated to terminate its employee for "lying" under these circumstances.

Therefore, defendant's Motion for Summary Judgment as to plaintiff's age discrimination termination claim is due to be denied.

19

## C. RETALIATORY DISCHARGE

Plaintiff alleges that she was terminated in retaliation for "assist[ing] an African American applicant in obtaining a job and entering a training program at Dillard's." (Doc. 17 ¶¶ 22, 60.)  Defendant contends that plaintiff cannot establish a prima case of retaliation because she cannot prove that she engaged in any protected activity, (Def. Br. in Supp. of Mot. for Summ. J. at 16.), and she cannot prove that its articulated reasons for her discharge are unworthy of credence.

### 1.  Protected Activity

Title VII's anti-retaliation provision, 42 U.S.C. § 2000e-3(a) protects two general types of activity –  (1) participation and (2) opposition.

> Under the opposition clause, an employer may not retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a).  And, under the participation clause, an employer may not retaliate against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  *Id*.

> . . .  The participation clause covers participation in "an investigation . . . under this subchapter" . . . . 42 U.S.C. § 2000e-3(a).  This clause protects proceedings and activities which occur in conjunction with or after the filing of a formal charge with the EEOC; it does not include participating in an employer's internal, in-house investigation, conducted apart from a formal charge with the EEOC.  *See Silver v. KCA, Inc.*, 586 F.2d 138, 141 (9th Cir. 1978)(stating that participation means "participation in the machinery set up by Title VII to enforce its provisions").

> . . .

> . . . Opposition clause acts, however, are taken outside of the context of a government review and, instead, are taken in the context of the ordinary business environment and involve employers and employees as employers and employees. . . .

*E.E.O.C. v. Total System Services, Inc.*,   221 F.3d 1171, 1174, 1176 (11th Cir. 2000)(footnotes omitted).

Defendant argues that plaintiff's alleged protected activity is not protected by the participation clause because she filed her EEOC charge months after her termination.  (Def. Br. in Supp. Of Mot. for Summ. J. at 16.)   Plaintiff does not argue that her conduct "assist[ing] an African American applicant in obtaining a job and entering a training program at Dillard's,"  (doc. 17 ¶¶ 22, 60), was activity protected under the participation clause. Rather, she argues that her "recommendation of Tamika Holman, a black female, for a second interview was an action in ***opposition*** to the anything-but-subtle instruction to keep the number of black girls down, (Doc. 38 at 29-30.)

Defendant argues that plaintiff's alleged protected activity is not protected by the opposition clause because plaintiff "did not protest Moretti's supposed statement that Holman looked like a 'gang banger,'  and did not testify to any other type of opposition conduct." (Def. Br. in Supp. of Mot. for Summ. J. at 16-17.)   However, defendant's narrow interpretation of the opposition clause of § 2000e-3(a) has been rejected by the courts that have addressed the issue.

Although the Eleventh Circuit has not addressed the issue specifically, numerous other courts have found that an employee engages in protected opposition activity when she "refuses to take part in the employer's discriminatory employment practices."  *See* II Lex K. Larson, EMPLOYMENT DISCRIMINATION §34.03[1][c] (2d ed. 2005)(citing, *inter alia*, *EEOC v. St. Anne's Hospital*, 664 F.2d 128 (7th Cir. 1981); *De Anda v. St. Joseph Hospital*, 671 F.2d 850 (5th Cir. 1982); *Tidwell v. American Oil Co.*, 332 F. Supp. 424 (D. Utah. 1971); *Taylor v. Scottpolar Corp.*, 75 F.E.P. 1571,  *amended order* 995 F.Supp. 1072 (D. Ariz. 1998); EEOC v. HBE Corp., 135 F.3d 543 (8th Cir. 1998); *Goos v. National Association of Realtors*, 715 F. Supp. 2 (D.D.C. 1989)); *see also Holdren v. General Motors Corp.*, No. 97-2538-JWL, 1998 WL 990997, *7 (D. Kan. Dec. 7, 1998).[2]

"Under the terms of [42 U.S.C. § 2000e-3(a)], requiring an employee to discriminate is itself an unlawful employment practice.  If [the employee] can demonstrate at trial that he was discharged for refusing to implement a policy that discriminates against [a class of persons protected by Title VII], he has stated a claim under that section . . . ."  *Moyo v.*

_____

[2]The *Holdren* court held:

Congress intended to protect from retaliation those employees who refuse to comply with a discriminatory directive of his or her employer and then suffer an adverse action based on his or her refusal to commit the discriminatory act. ***An employer should not escape liability for taking such adverse action simply because the employee to whom the unlawful directive is given remains silent in the face of the directive yet refuses by his or her actions to comply with the directive***.

*Holdren*, 1998 WL 990997 at *7 (emphasis added).

*Gomez*, 32 F.3d 1382, 1385 (9th Cir. 1994), *quoted in Chandler v. Fast Lane, Inc.*, 868 F.

Supp. 1138, 1145 (E.D. Ark. 1994).

In *EEOC v. St. Anne's Hospital*, 664 F.2d 128 (7th Cir. 1981), the Seventh Circuit

Court of Appeals rejected an argument almost identical to defendant's argument in this case;

that court held:

> It is manifest that an employee without hiring authority who witnessed the rejection of a job applicant on the basis of that applicant's race could protest the unlawful employment practice and be protected from discharge by section [2000e-3(a)]. In our view, it must be equally clear that an employee with hiring authority who hires the applicant she believes is best qualified and subsequently is discharged because the applicant she hired is black is similarly protected. Surely, it would impede voluntary compliance with Title VII, a primary aim of section [2000e-3], if employees in decision-making positions who hired minority applicants had to fear losing their own jobs because of the racial bias of others. Section [2000e-3(a)] was specifically designed to encourage employees to act to protect Title VII rights, and that is what Herzon has assertedly done. We agree with the Commission that Herzon has demonstrated her opposition to unlawful discrimination by hiring the applicant she considered most qualified for the job without regard to his race.

*St. Anne's Hospital*, 664 F.2d 128, 132-33 (7th Cir. 1981)(footnotes omitted).

This court now holds that a plaintiff may establish that she engaged in protected

opposition activity, for purposes of establishing a prima facie case of retaliation, by

demonstrating that she "refuse[d] to comply with a discriminatory directive of . . . her

employer," even though she "remain[ed] silent in the face of the directive." *Holdren*, 1998

WL 990997 at *7; *see also St. Anne's Hospital*, 664 F.2d. at 132-33.

In this case, plaintiff presented evidence from which a reasonable jury could find that

Moretti did not want plaintiff to hire any more blacks in her departments, and that he

23

believed she had hired Holman, who is black.  For purposes of summary judgment, the court finds that plaintiff's recommendation/hiring of Holman was protected opposition activity.

Because defendant does not challenge any other element of plaintiff's prima facie case, the court finds sufficient evidence, for summary judgment purposes, to establish a prima facie case of retaliation.

### 2.  Pretext

For the reasons set forth above, the court finds that plaintiff has presented substantial evidence that defendant's articulated reasons for her termination are unworthy of credence. Therefore, the court finds that defendant's Motion for Summary Judgment as to plaintiff's retaliatory discharge claim is due to be denied.

## B.  AGE AND SEX DISCRIMINATION – HOSTILE ENVIRONMENT

Plaintiff alleges that defendant "subjected [her] to threatening, bellicose, demeaning, hostile and offensive conduct by her supervisor because of her sex on a basis that affected the terms and condition of her employment, her ability to perform the duties and functions of her job, and which culminated in adverse employment action." (Doc. 17 ¶ 33.)   She also alleges that she was subject to "harassment and hostility" because of her age.  (*Id*. ¶¶ 60-61.) Defendant contends that plaintiff cannot establish that the harassing conduct at issue was based on plaintiff's sex or her age, that the conduct was sufficiently severe or pervasive to alter the terms and conditions of plaintiff's employment, and/or that there is a basis for holding defendant liable for Morreti's alleged harassing conduct.  Because plaintiff has not

shown that the harassment was severe or pervasive, the court pretermits discussion of defendant's other grounds for granting its Motion for Summary Judgment on this claim.

"When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 78 (1998). In *Gupta v. Florida Board of Regents*, the Eleventh Circuit held:

> The fourth element – that the conduct complained of was "sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment" – is the element that tests the mettle of most sexual harassment claims. Requiring the plaintiff to prove that the harassment is severe or pervasive ensures that Title VII does not become a mere "general civility code."

*Gupta v. Florida Board of Regents*, 212 F.3d 571, 583 (2000)(citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). "Title VII prohibits only the type of severe or pervasive sexual harassment that 'alter[s] the conditions of the victim's employment.'" *Johnson v. Booker T. Washington Broadcasting Service*, 234 F.3d 501, 509 (11th Cir. 2000)(quoting *Oncale*, 523 U.S. at 80-81). It "does not prohibit all verbal or physical harassment in the workplace, and does not reach genuine, but innocuous, differences in the ways men and women routinely interact with members of the same sex and of the opposite sex." *Id.* (internal quotations omitted). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher*, 524 U.S. at 788.

In *Mendoza*, the Eleventh Circuit, sitting en banc, reiterated the standards applicable to hostile environment claims:

> Establishing that harassing conduct was sufficiently severe or pervasive to alter an employee's terms or conditions of employment includes a subjective and an objective component.  . . . .  The employee must subjectively perceive the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable.  The environment must be one that a reasonable person would find hostile or abusive and that the victim subjectively perceives to be abusive.  Furthermore, the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.

> The objective component of this analysis is somewhat fact intensive.  Nevertheless, the Supreme Court and this Court have identified the following four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: (1) *the frequency of the conduct*; (2) *the severity of the conduct*; (3) *whether the conduct is physically threatening or humiliating, or a mere offensive utterance*; and (4) *whether the conduct unreasonably interferes with the employee's job performance*.  The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment.

*Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999)(internal quotations and citations omitted; emphasis added).  The Supreme Court in *Faragher*, held, "We have made it clear that conduct must be ***extreme*** to amount to a change in the terms and conditions of employment . . . ."  *Faragher*, 524 U.S. at 788 (emphasis added; citations omitted).

According to plaintiff's evidence, she contends "two encounters with Steve Moretti in the two or so weeks she worked with him" are sufficient to establish that her work

26

environment was hostile due to Moretti's sexual harassment of her.  (Pl. Br. in Opp. to Mot. for Summ. J. at 23.)  The first "encounter" involved Moretti grabbing her neck, turning her head, and telling her that her wall looked like "shit."  The second "encounter" is the meeting in which Moretti "screamed and yelled at her for approximately two hours" before terminating her employment.  (*Id*. at 24.) These incidents, considered in totality of the circumstances, are not sufficiently *extreme* to alter plaintiff's work environment. Compare *Hulsey v. Pride Restaurants*, 367 F.3d 1238, 1248 (11th Cir. 2004)(finding harassment was objectively severe and pervasive based on 18 incidents over two and half weeks including the harasser's "direct as well as indirect propositions for sex," "following [plaintiff] into the restroom, and repeated attempts to touch her breasts, place his hands down her pants, and pull off her pants," and "enlisting the assistance of others to hold her while he attempted to grope her"); *Johnson*, 234 F.3d at 509 (finding harassment was objectively severe and pervasive based on "fifteen separate instances of harassment over the course of four months,"which included the harasser "giving [plaintiff] unwanted massages, standing so close to [plaintiff] that his body parts touched her from behind, and pulling his pants tight to reveal the imprint of his private parts") with *Gupta*, 212 F.3d at 584-85 (harassing conduct - including "one occasion [when harasser said], 'You are looking very beautiful,'" frequent telephone calls, isolated "comments about the promiscuity of people from Jamaica as compared to the innocence of people from India," harasser "stared at [plaintiff] twice, touched her ring and bracelet once, and kept asking her to lunch," and harasser "plac[ed] his

hand on [plaintiff's] knee once, and . . touch[ed] the hem of her dress once" over six or seven months – was not sufficiently severe or pervasive conduct); *Mendoza*, 195 F.3d at 1247 (harassing conduct – "(1) one instance in which [the harasser] said to [plaintiff,] 'I'm getting fired up'; (2) one occasion in which [the harasser] rubbed his hip against [plaintiff's] hip while touching her shoulder and smiling; (3) two instances in which [harasser] made a sniffing sound while looking at [plaintiff's] groin area and one instance of sniffing without looking at her groin; and (4) [harasser's] 'constant' following and staring at [plaintiff] in a 'very obvious fashion'" – not sufficiently severe or pervasive).

Therefore, because the court finds that the harassment was not sufficiently severe or pervasive to support a claim for sexual harassment, defendant's motion for Summary Judgment is due to be granted and plaintiff's sexual harassment claim will be dismissed.

## D. SEX DISCRIMINATION – PROMOTION AND "TERMS AND CONDITIONS"

In her Amended Complaint, plaintiff alleges:

26.  This is a claim against Dillard's for the intentional discrimination against plaintiff because of her sex, female, in violation of Title VII.

27.  Plaintiff is female and therefore a member of a protected class.

28.  Plaintiff's membership in a protected class, was a motivating factor in Dillard's subjecting her to terms and conditions of employment less favorable than that enjoyed by male employees.

29.  It is clear that Dillard's has a "glass ceiling" above which older female managers generally may not rise unless they are useful to Dillard's as tokens and to provide cover for the illegal and discriminatory actions of their management.  Since most females are "going nowhere with the company" they

are targeted by aggressive store managers such as Moretti for hostile treatment in an effort to make them quit.  Males are not treated in this fashion.

(Doc. 17 ¶¶ 26-29.)

To the extent that plaintiff's Amended Complaint states a claim for sex discrimination with regard to promotions or some discriminatory 'term and condition" of her employment other than that covered by her hostile work environment and discharge claims, the court finds plaintiff has abandoned such claims.  *See Smith v. International Paper Co.*, 160 F. Supp. 2d 1335, 1347 (M.D. Ala. 2001)(citing *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.), *cert. denied* 516 U.S. 817 (1995)).  Defendant's Motion for Summary Judgment as to any claim based on plaintiff's claims of sex discrimination with regard to promotion or other "terms and conditions," not including her termination and hostile work environment claims discussed *supra*, will be granted, and such claims will be dismissed.

## D. WANTON/NEGLIGENT/INTENTIONAL HIRING, SUPERVISION, TRAINING, AND RETENTION

Plaintiff contends that defendant negligently, wantonly, and/or intentionally hired, retained, and failed to supervise and train Moretti, and failed to train Davis, Willey, and Squires.  Specifically she claims:

55.  Dillard's [negligently, wantonly, and/or intentionally] selected Moretti, hired him, and placed him in a management position over the plaintiff. Dillard's [negligently, wantonly, and/or intentionally] failed to train Moretti, Davis, Squires, Willey, and other management employees to prevent [gender-based] harassment, assaults, batteries, hostility, and outrageous conduct in the workplace.

56. Dillard's [negligently, wantonly, and/or intentionally] failed to train Moretti, Willey, and other management employees to handle and respond to complaints about sexual harassment, assaults, batteries, outrageous conduct, hostility in the workplace. Dillard's and Willey [negligently, wantonly, and/or intentionally] failed to investigate complaints about harassment, and other outrageous conduct in the workplace.

57. Dillard's and Willey [negligently, wantonly, and/or intentionally] failed to supervise Moretti when it knew or should have known of his pattern of inappropriate conduct in the workplace . . . .

58. Dillard's and Willey [negligently, wantonly, and/or intentionally] retained Moretti in a management position when it knew or should have known of his pattern of inappropriate conduct in the workplace . . . .

(Doc. 17 ¶¶ 55-58; *see id*. ¶¶ 38-42, 46-50.)

Pursuant to Alabama law:

[I]n the master and servant relationship, the master is held responsible for the servant's incompetency when notice or knowledge, either actual or presumed, of the incompetency has been brought to the master. For the master to be held liable for the servant's incompetency, it must be affirmatively shown that had the master exercised due and proper diligence, the master would have learned of the incompetency. ***This may be done by showing specific acts of incompetency and showing that they were brought to the knowledge of the master, or by showing them to be of such a nature, character, and frequency that the master, in the exercise of due care, must have had notice of them***. While specific acts of alleged incompetency cannot be shown to prove that the servant was negligent in doing or omitting to do the act complained of, it is proper, when ***repeated*** acts of carelessness and incompetency of a certain character are shown on the part of the servant, to leave it to the jury to determine whether they would have come to the master's knowledge had the master exercised ordinary care.

Assuming [plaintiff] has been damaged by the acts of [the alleged incompetent servant], she has not established that the damage occurred because of any incompetency on [the servant's] part for which [defendant-employer] might conceivably be liable. [Plaintiff] has shown only that

30

> [defendant-employer] may have received notice of [the servant's] alleged incompetency on . . . the last day of her employment with [defendant-employer]. She did not report [the servant's] conduct to [defendant-employer] before that date. This may be sufficient to survive a summary judgment motion as to claims of liability based on [defendant-employer's] ratification of [the servant's] conduct, but it is insufficient to allow [plaintiff] to present this issue to a jury on the issue of negligent training and supervision.

*Mardis v. Robbins Tire & Rubber Co.*, 669 So.2d 885, 890 (1995)(citing *Big B, Inc. v. Cottingham*, 634 So. 2d 999, 1003 (Ala. 1993)).

Plaintiff relies on evidence of a single complaint of discrimination against Moretti (the Anderson incident) to prove that Dillard's knew or should have known "that Moretti had . . . discriminatory or harassing traits or practices" or "that Moretti was likely to engage in unlawful discrimination, harassment, or retaliation and failed to do anything about it. (Pl. Br. in Opp. to Mot. for Summ. J. at 39-40.) However, pursuant to Alabama law, this single incident of alleged wrongful or negligent behavior is not sufficient evidence to support a finding that defendant knew or should have know that its employee was "incompetent." *See Sanders v. Shoe Show, Inc.*, 778 So.2d 820, 824 (Ala. Civ. App.), *certiorari denied* (Ala. 2000); *see also Alabama City, G. & A. Ry. Co. v. Bessiere*, 66 So. 805, 807 (Ala. 1910)("Now, as to incompetency . . . deficiency in a servant is not shown by an instance of negligence on the part of the servant; nor would that be sufficient to allow the imputation to the master of notice of his incompetency. Negligence is not synonymous with incompetency. The most competent may be negligent.)(internal citations and quotations omitted).

31

The court finds that defendant's Motion for Summary Judgment as to plaintiff claims of negligent, wanton, and/or intentional failure to train, hire, supervise and retain, is due to be granted.[3]

## CONCLUSION

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law as to all plaintiff's claims, except her discriminatory and retaliatory termination claims. The record contains sufficient evidence of disputed material facts with regard to plaintiff's discriminatory and retaliatory termination claims such that a reasonable jury could return a verdict for plaintiff on those claims. Therefore, an Order denying defendant's Motion for Summary Judgment as to plaintiff's discriminatory and retaliatory termination claims and granting its Motion for Summary Judgment as to the remaining claims will be entered contemporaneously with this Memorandum Opinion.

---

[3]In addition to lack of notice, Defendant argues that Alabama does not recognize a negligent supervision, retention, and/or training claim based on the employee's commission of an act of discrimination. (Def. Br. in Supp. of Mot. for Summ. J. at 18 [citing *Hathorn v. Boise Cascade Corp.*, No. 97-0521-BH-M, 1998 U.S. Dist. Lexis 18113 at *24-25 (S.D. Ala. Nov. 3, 1998); *Thrasher v. Ivan Leonard Chev.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002]); *see also Hanes v. Mobile Infirmary Medical Center*, 2005 WL 1840236, *18 (S.D. Ala. Aug. 2, 2005)("[T]he Alabama Supreme Court has held that a plaintiff is required to prove ***an underlying common-law tort*** in order to prevail in a claim for negligent supervision, training or retention.")(emphasis added; citations omitted). Because this court finds that defendant did not have notice that Moretti was incompetent, the court pretermits discussion of whether Alabama would recognize a common-law tort claim against defendant based on Moretti's discrimination.

**DONE**, this 30th day of September, 2005.

_Sharon Lovelace Blackburn_
_____
SHARON  LOVELACE  BLACKBURN
UNITED STATES DISTRICT JUDGE